SUMMIT NURSING HOME, INC.,

v.

The UNITED STATES.

No. 89–74.

United States Court of Claims.

Feb. 22, 1978.

Thomas C. Fox, Washington, D. C., for plaintiff; William A. Geoghegan, Washington, D. C., attorney of record; George R. Clark and Pierson, Ball & Dowd, Washington, D. C., of counsel.

Jean Schepers, Washington, D. C., for defendant; Asst. Atty. Gen. Barbara Allen Babcock; Julie P. Dubick and David R. Schlee, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and KUNZIG, Judges.

## ON THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

COWEN, Senior Judge:

Plaintiff, a Maryland corporation, is a provider of skilled nursing care to persons eligible for those services under the Social Security Act, 42 U.S.C. §§ 1395, *et seq.,* commonly referred to as the Medicare program. Plaintiff brought this action to recover the sum of $47,189. This amount had been allowed for accelerated depreciation and paid as a reasonable cost reimbursement owed plaintiff for services as a provider of skilled nursing care under the Medicare program, but the $47,189 was subsequently recaptured by the defendant through its agent, Mutual of Omaha, pursuant to 20 C.F.R. § 405.415(d)(3), issued by the Social Security Administration, Department of Health, Education, and Welfare (HEW).

The case was first argued before the court on defendant's motion to dismiss and plaintiff's opposition thereto. At that time, the court was informed that a proposed regulation concerning the extent and incidence of retroactivity under 42 U.S.C. § 1395x(v) (Supp. V 1975) had been published in June 1975 (40 Fed.Reg. 26535), but we did not know whether that or any other pertinent regulation had been adopted, or what the position of HEW was on the proposed regulation. Accordingly, by order of October 21, 1976, 211 Ct.Cl. 346, we remanded the case to HEW for a renewed determination of plaintiff's claim, in accordance with the present policy and position of HEW. Thereafter, the defendant filed its response to the court's order, and by means of a letter and affidavit attached, advised the court that the proposed regulation had not been adopted and that no new regulation or instruction had been promulgated or issued by the Secretary of HEW (hereinafter Secretary) which would affect the recapture of accelerated depreciation from a provider because of a decline in the utilization of its facilities by Medicare patients. Following the responses to the court's orders, plaintiff filed its motion for summary judgment and defendant its cross-motion for summary judgment.

After again hearing oral argument and considering the pleadings, motions, and briefs of the parties we have, for the reasons to be set forth, concluded that plaintiff is not entitled to recover and that its petition should be dismissed.

### I.

Under the "Medicare" provisions of the Social Security Act, a provider, such as plaintiff, is not paid for its services by the

patients. Instead, the provider is reimbursed by the Secretary from the Federal Hospital Insurance Trust Fund, which is financed by special wage taxes. 42 U.S.C. § 1395i. Pursuant to 42 U.S.C. § 1395g, a provider receives interim pre-audit reimbursements not less than monthly based on billings submitted to the Secretary or his designate. At the close of the fiscal year, the provider submits a cost report and the Secretary then determines by audit the actual amount of reimbursement which the provider is entitled to for that year. 20 C.F.R. § 405.451(b)(1). Adjustments are thereafter made in the current interim payments in accordance with the amount determined to be due the provider as shown by the audit. The Medicare program is administered in substantial part by private organizations under contract with the Secretary. 42 U.S.C. § 1395h authorizes a provider to nominate a private organization to act as fiscal intermediary. Plaintiff became a provider of services under the program on January 1, 1967 and nominated Mutual of Omaha. Mutual of Omaha then entered into an agreement with the Secretary to act as fiscal intermediary for plaintiff. The provider submits its bills for all services to the intermediary, who is responsible for their payment as agent for the Secretary. Section 1395f(b) (Supp. V, 1975) provides that the total amount to be paid to a provider shall be "the reasonable cost" of services rendered to Medicare beneficiaries as determined under section 1395x(v). The latter section states that reasonable costs shall be determined in regulations issued by the Secretary establishing the methods of cost calculation. Section 1395x(v)(1)(A)(i) further provides that the regulations must take into account direct and indirect costs of providers so that costs for individuals covered by the insurance program will not be borne by individuals not covered, and that costs with respect to individuals not covered will not be borne by the insurance program. Section 1395x(v)(1)(A)(ii) also requires that the regulations must provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive."

From 1966 until August 1, 1970, the regulations permitted an allowance for accelerated depreciation on capital assets as a reimbursable cost. 20 C.F.R. § 405.415 (1967). Plaintiff exercised its option to claim an allowance for accelerated depreciation as an item of reimbursable cost and its claims on that basis were approved for the fiscal years ending October 31, 1967 through October 31, 1971.

Beginning in 1969, HEW issued new and more restrictive guidelines to intermediaries for determining the eligibility of persons for Medicare benefits in skilled nursing facilities. As a result, there was a substantial decline in Medicare utilization of plaintiff's facility.[1]

On February 5, 1970, the Secretary published a proposed regulation regarding depreciation, 35 Fed.Reg. 2593. It was announced that the following changes would be made in the treatment of accelerated depreciation: (a) nursing homes certified after August 1, 1970 could not use that method of calculating depreciated costs; (b) providers then participating in the program could not use the accelerated method or newly acquired assets; (c) on capital assets for which the accelerated method of depreciation had been used prior to August 1, 1970, that method could continue to be used; and of particular pertinence to this litigation (d) if a provider terminated its participation in the program, or if the Medicare proportion of its allowable costs decreased substantially, the Secretary could recover "the excess of reimbursable costs determined by using accelerated depreciation methods when these costs had been paid over the reimbursable costs which

---

1. Although defendant has not admitted that the decline in the use of plaintiff's facility by Medicare patients was due to the restricted eligibility requirements, there is some evidence to indicate that plaintiff's assertion on this point is correct and for the purposes of this motion, we have accepted it as true.

would have been determined and paid by using the straight-line method of depreciation." On August 1, 1970, the new regulation promulgated by the Secretary, 20 C.F.R. § 405.415(d)(3), became effective. It provided as follows in relevant part:

> When a provider who has used an accelerated method of depreciation with respect to any of its assets terminates participation in the program, or where the health insurance proportion of its allowable costs decreases so that cumulatively substantially more depreciation was paid than would have been paid using the straight-line method of depreciation, the excess of reimbursable cost, determined by using accelerated depreciation methods and paid under the program over the reimbursable cost which would have been determined and paid under the program by using the straight-line method of depreciation will be recovered as an offset to current reimbursement due or, if the provider has terminated participation in the program, as an overpayment. In this determination of excess payment, recognition will be given to the effects the adjustment to straight-line depreciation would have on the return on equity capital and on the allowance in lieu of specific recognition of other costs in the respective years.

The regulation of August 1, 1970 did not state expressly that it would be applied retroactively to the fiscal years audited prior to the issuance of the regulation. However, in May 1972, the Bureau of Health Insurance issued a proposed revision to the Providers Reimbursement Manual which was referred to as a manualization of the regulation of August 1, 1970. The manual provided for the retroactive recovery of the amount by which accelerated depreciation costs exceeded costs permitted under the straight-line method of depreciation for all providers who terminated their participation in the program after July 1, 1970. However, providers who had previously taken accelerated depreciation allowances and terminated their participation prior to August 1, 1970, would not be subjected to recovery. Providers who remained in the program after the effective date of the regulation would, if they terminated participation in the program or if there was a substantial decline in Medicare utilization of their facilities, be subject to a recovery of accelerated depreciation costs retrospectively to the date of their entry in the program. In plaintiff's case, this was January 1967. The manual revision was issued as section 136 of HIM–15 (Providers Reimbursement Manual). On May 25, 1972, Mutual of Omaha notified plaintiff that pursuant to the manualization of the regulation, it was recapturing $44,000 in costs previously determined to be due plaintiff as reimbursement for accelerated depreciation in excess of the amounts that would have been allowed for straight-line depreciation for the fiscal years ending October 31, 1967 through October 31, 1971. Subsequently in January 1974, Mutual of Omaha revised the amount of the excess depreciation allowance to be recovered from plaintiff to a total of $47,189, for which plaintiff now seeks recovery. The amount claimed was recovered from plaintiff by withholding Medicare reimbursement payments due plaintiff.

## II.

Plaintiff's contentions require us to decide the following issues:

1. Whether the retroactive application of the regulation (20 C.F.R. § 405.415(d)(3) is authorized by the Medicare Act and the Administrative Procedure Act.

2. Whether the retroactive application of the regulation which resulted in the recapture of accelerated depreciation costs allowed prior to August 1, 1970, contravened the due process clause of the Fifth Amendment.

3. Assuming arguendo that the changes made by the Secretary in eligibility requirements in 1969 caused a decrease in plaintiff's participation in the Medicare program, was the Secretary's action in recouping funds from the plaintiff an unlawful and invalid act?

4. Assuming arguendo that some fiscal intermediaries refused to enforce the regulation retroactively against other providers in the same position as plaintiff, was the application of the regulation to plaintiff a denial of equal protection of the law?

Several recent appellate decisions have upheld both the constitutional and statutory validity of the regulation. *Springdale Convalescent Center v. Mathews,* 545 F.2d 943 (5th Cir. 1977); *Adams Nursing Home, Inc. v. Mathews,* 548 F.2d 1077 (1st Cir. 1977); *Hazelwood Chronic & Convalescent Hosp., Inc. v. Weinberger,* 543 F.2d 703 (9th Cir. 1976) *vacated and remanded on other grounds,* 430 U.S. 952, 97 S.Ct. 1595, 51 L.Ed.2d 801 (1977).

Plaintiff relies on the following district court decisions: *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger,* C.A. No. 73–210 (D.Or.1974), *rev'd,* 543 F.2d 703 (1976); *South Windsor Convalescent Home, Inc. v. Weinberger,* 403 F.Supp. 515 (D.Conn.1975) *rev'd for lack of jurisdiction,* 541 F.2d 910 (2d Cir. 1976); *Columbia Heights Nursing Home, Inc. v. Weinberger,* 380 F.Supp. 1066 (M.D.La.1974); *Mt. Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 376 F.Supp. 1099 (S.D.Fla.1974), *rev'd,* 517 F.2d 329 (5th Cir. 1975), and *Fairfax Nursing Center, Inc. v. Califano,* C.A. No. 77–83–A (E.D.Va. June 2, 1977), *appeal filed* 4th Cir. July 22, 1977.

After a review of the two lines of decisions, we find that we are in agreement with the opinions of the First, Fifth and Ninth Circuits, and follow them as a basis for deciding the issues in this case.

### III.

Plaintiff has challenged the statutory validity of the regulation (20 C.F.R. § 405.-415(d)(3)) on several grounds.

■ Plaintiff first argues that the "retroactive corrective adjustment" required by section 1395x(v)(1)(A)(ii) is limited to a single prior fiscal period in order that the interim monthly payments to a provider may be brought into agreement with the amounts found payable by the audit for the fiscal year in question. This contention was flatly rejected by the Second Circuit in *Kingsbrook Jewish Medical Center v. Richardson,* 486 F.2d 663, 669–70 (2d Cir. 1973); by this court in *Whitecliff, Inc. v. United States,* 536 F.2d 347, 352 & n. 11, 210 Ct.Cl. 53, 60 & n. 11 (1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), and by the Fifth Circuit in *Springdale Convalescent Center v. Mathews, supra,* at 954. In *Kingsbrook,* the court explained that the requirement that the interim payments be reconciled with the final audit figure, is set forth in a separate section (section 1395g) which covers adjustments resulting from "'previously made overpayments or underpayments * * *.'" The court further declared that section 1395x(v)(1) deals with the corrective adjustments that are "designed to rectify mistakes made by HEW in formulating a particular method of determining cost," and that the retroactive corrective adjustments required by that section are not limited to a single prior fiscal period. Moreover, the validity of the regulation has been upheld by the appellate courts on the ground that it is mandated by section 1395x(v)(1)(A)(ii); is "reasonably related to the purposes of the enabling legislation," and represents a determination by the Secretary resulting from "the exercise of his economic judgment in an area committed to his expertise." *Springdale Convalescent Center v. Mathews, supra,* at 951, 955.

■ Plaintiff's next contention is that the regulation and the retroactive adjustment made thereunder were not authorized by statute, because the Secretary failed to make a formal finding that the prior method of reimbursing providers was inadequate or excessive. There is nothing in the governing statute which requires such a finding, but plaintiff argues that we held in *Whitecliff, supra,* that before the retroactive adjustment could be made, the Secretary had to make the finding. Plaintiff has misinterpreted our holding in *Whitecliff.* There the plaintiff provider challenged the rejection of an attempt to use its work measurement study to prove that the cur-

rent cost method was inadequate. We decided that the government's attempt to correct the situation by a prospective regulation, which permitted a change in method, did not comply with the statutory requirement for a regulation that would make "suitable retroactive corrective adjustments." We relied on the Second Circuit's decision in *Kingsbrook* and stated that section 1395x(v)(1)(A)(ii) authorized the retroactive adjustments for any prior period where the current method of adjustment had proven to be inadequate or excessive. We did not require a formal finding by the Secretary of an inadequate or excessive method.

Further responsive to this contention of plaintiff is the implied conclusion of the First Circuit in *Adams Nursing Home, supra,* at 1082, that the regulation itself is a determination that "accelerated depreciation exaggerates the true cost of providing services." The Fifth Circuit reached the same conclusion in *Springdale Convalescent Center, supra.* We agree.

▮▮▮▮ In its third challenge to the validity of the regulation, plaintiff contends that the Administrative Procedure Act, 5 U.S.C. § 551(4) limits the Secretary's rule-making authority to the promulgation of regulations of prospective application. Plaintiff emphasizes the word "future" in section 551(4).[2] The rule regarding the validity of retroactive regulations was stated by the Supreme Court in *Securities and Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) as follows:

> Hence we refuse to say that the Commission, which had not previously been confronted with the problem of management trading during reorganization, was forbidden from utilizing this particular proceeding for announcing and applying a new standard of conduct. Cf. *Federal*

*Trade Commission v. Keppel & Bro.,* 291 U.S. 304, [54 S.Ct. 423, 78 L.Ed. 814]. *That such action might have a retroactive effect was not necessarily fatal to its validity.* Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. *If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law.* See Addison v. Holly Hill Co., 322 U.S. 607, 620, [64 S.Ct. 1215, 1222, 88 L.Ed. 1488] [emphasis added].

As we have previously emphasized, the regulation issued here was mandated by statute so that it can hardly be said that it was contrary to the "statutory design." It is well settled, that administrative agencies are required to follow a congressional mandate. *United Steelworkers of America, AFL–CIO v. N.L.R.B.,* 129 U.S.App.D.C. 80, 390 F.2d 846 (1967), *cert. denied,* 391 U.S. 904, 88 S.Ct. 1644, 20 L.Ed.2d 419 (1968). We therefore conclude that the recapture regulation in issue in this case was not prohibited by 5 U.S.C. 551(4). *Adams Nursing Home, Inc. v. Mathews, supra,* at 1080 n. 8.

## IV.

Relying heavily on the district court decisions cited above, plaintiff's main contention in this case is that the recapture provisions of the regulation before us violate the Fifth Amendment guarantee of due process. In the cases cited above, the First, Fifth, and Ninth Circuits have considered the constitutional issue so thoroughly that we need only summarize respectively their conclusions that the retroactive application

---

2. Section 551(4) provides:

"(4) 'rule' means the whole or a part of an agency statement of general or particular applicability and *future* effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and in-

cludes the approval or prescription for the *future* of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;" (emphasis added.)

of the recapture provisions of the regulation did not constitute a denial of due process:

■ 1. In passing on the validity of a retroactive ruling, courts generally compare the public interest in the retroactive rule with the "private interests that are overturned by it." When the providers entered into this program, they must have been aware that they were joining a new government program which would be subject to future regulation by the Secretary. *Adams Nursing Home, Inc. v. Mathews, supra,* at 1080–81.

■ 2. The Secretary had a right to issue the regulation in order to cure the defect arising from prior mistakes in the administration of the program, and the retroactive application of the recapture proceedings was required by act of Congress to insure that the reimbursement provided by the government will go to pay only for the costs of services to Medicare beneficiaries. *Springdale Convalescent Center v. Mathews, supra,* at 956.

3. The retroactive effects of the regulation were limited and reasonable; it was not made effective until nearly 6 months after notice of its promulgation was given; it is particularly reasonable "since it is part of the ongoing adjustment necessary in a program of distributing federal subsidies." *Hazelwood Chronic & Convalescent Hosp., Inc. v. Weinberger, supra,* at 708.

### V.

In urging us not to follow the above-cited appellate decisions, plaintiff points to a factual distinction in this case. In each of those cases, the provider voluntarily terminated its participation in the program after August 1, 1970. In each, the courts observed that the provider might have avoided the recapture of payments previously received by terminating participation in the program before August 1, 1970, and that termination thereafter would result either in a windfall to the provider or a decrease in the cost of caring for non-Medicare patients at the expense of Medicare patients. There was a substantial decline in the number of Medicare patients served by plaintiff from the latter part of 1969 until the end of 1972. Plaintiff alleges and we have assumed that this substantial reduction occurred because HEW issued new and more restrictive guidelines to intermediaries for determining the eligibility for Medicare benefits in nursing homes. In support of its argument that these facts distinguish this case from the circuit cases cited, plaintiff cites a decision of June 8, 1977 by the Provider Reimbursement Review Board.[3] In that case, the Board found that the change in the provider's Medicare utilization was not the result of any admission policy of the provider, but was substantially "related to a change in eligibility requirements for Medicare benefits * * *." The Board concluded that the intermediary's recapture of depreciation in excess of straight-line depreciation was proper for periods ending after December 31, 1969, but was improper for periods ending on or before December 31, 1969, because such a result would penalize the provider for its decrease in Medicare utilization just the same as if the decrease had been voluntary. The Board concluded that this would be contrary to the principles of reasonableness and equitable treatment. Plaintiff makes this same argument.

■ We find this to be the most appealing argument which has been advanced in plaintiff's behalf. Consequently it becomes necessary to consider whether, under all the circumstances, the "retroactive application [of the regulation] is so harsh and oppressive as to transgress the constitutional limitation [imposed by the Fifth Amendment]." *Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 126, 83 L.Ed. 87 (1938). Retroactive application of a regulation will not be declared unconstitutional unless after a balancing of the considerations on both sides it is determined that the regulation is unreasonable. Hochman, *The Supreme Court and the Constitutionality of Retroactive*

3. (1977), Medicare & Medicaid Guide (CCH) para. 28,519, at 9845.

*Legislation,* 73 Harv.L.Rev. 692, 694 (1960). The same commentator has observed that the Supreme Court has frequently sustained the retroactive operation of statutes where contracts are made or property rights are acquired in an area that is subject to regulation, *id.* at 700. The strong public interest in the smooth functioning of government has resulted in favorable treatment of curative statutes. The "interest in the retroactive curing of such a defect in the administration of government outweighs the individual's interest in benefiting from the defect," *id.* at 705–06.

■ After weighing and considering all of the factors involved, we do not find that the retroactive application of the regulation in plaintiff's case violated its constitutional rights. It may very well be true that the recapture of money paid plaintiff frustrated the financial plans which plaintiff had made for capitalizing the cost of assets it had constructed to provide services to both Medicare and non-Medicare patients. Nevertheless, the Secretary determined, in the regulation, that when a substantial decrease in the utilization of plaintiff's facilities by Medicare patients occurred, a continued allowance of accelerated depreciation at the rate previously approved would result in a situation where the non-Medicare patients would get the benefit of expenditures made solely for the benefit of Medicare patients. In view of the explicit statutory obligation imposed on the Secretary, we cannot say that the retroactive recapture here was such an unreasonable or oppressive application of the regulation that it constituted a denial of due process.

Plaintiff also argues that it could not have terminated its participation in the Medicare program when it was notified of the proposed amendment to the existing regulation in February 1970, because of the provisions of 20 C.F.R. § 405.613 (33 Fed. Reg. 11274, August 8, 1968). Section (a) of this regulation stated that if a provider gave notice to terminate, the Secretary had a right to accept the termination date specified or to set a different date, and that if the notice did not specify a date, the Secre-

tary would set a date which was not more than 6 months from the date of the receipt of the notice. Therefore, plaintiff says that it could not have left the program until October 31, 1970 at the earliest. However, section (b) of the same regulation provided that the Secretary could permit termination by providers less than 6 months before the termination date stated in their notices, if the Secretary determined that to do so would not unduly disrupt the furnishing of services to the community by the provider, or otherwise interfere with the effective and efficient administration of the health benefits program provided by the Act.

Plaintiff does not claim that it made any request to terminate its participation in the program prior to August 1, 1970, or that such a request was denied by the Secretary. Therefore, we are not faced with the difficult problem that would have been presented if those events had occurred.

## VI.

■ Plaintiff's final contention is that some fiscal intermediaries, even as late as 1974, refused to enforce the regulation retroactively against providers who were in the same position as plaintiff, and that this discriminatory action denied plaintiff "equal protection of the law." To the extent that this unequal treatment occurred, the unauthorized acts of the intermediaries were not binding on the Secretary. *Utah Power & Light Co. v. United States,* 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917); *Bornstein v. United States,* 170 Ct.Cl. 576, 345 F.2d 558 (1965). Since the statute required the Secretary to make the retroactive corrective adjustments, the fact that some intermediaries may have failed to apply the regulation retroactively to other providers, was not an unlawful discrimination which violated plaintiff's constitutional rights. The situation is analogous to retroactive rulings made by the Commissioner of Internal Revenue to correct a mistake of law in the collection of income taxes. It has been repeatedly held that taxpayers are not entitled to relief against such retroactive rulings despite the fact that other tax-

payers had received favorable treatment under prior rulings. *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746, *reh. denied,* 353 U.S. 989, 77 S.Ct. 1279, 1 L.Ed.2d 1147 (1957); *Weller v. Commissioner of Internal Revenue,* 270 F.2d 294 (3d Cir. 1959), *cert. denied,* 364 U.S. 908, 81 S.Ct. 269, 5 L.Ed.2d 223 (1960); *Bornstein v. United States, supra.* We think the same principles are applicable here.

## VII.

It follows from the foregoing opinion that plaintiff's motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted, and plaintiff's petition is dismissed. In view of this disposition of the case, plaintiff's request that its petition be treated as a class action is also denied.